UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
CIVIL ACTION NO.: 5:23-CV-0036-D-RJ

| | |
|---|---|
| EPIC TECH, LLC and<br>BLUE STREAK BIDS, LLC,<br>　　　　　　　　　　　　Plaintiffs<br><br>　　　　v.<br><br>RALEIGH STARTUP SOLUTIONS LLC<br>DBA GOOD LUCK NC and<br>WWW.GOODLUCKNC.COM, et al,<br>　　　　　　　　　　　　Defendants | **Defendant Kaiser Hauter's<br>Memorandum in Opposition<br>to Motion for Preliminary Injunction<br>insofar as it is Directed to<br>Kaiser Hauter and to<br>the Domain www.NCOnlineGames.com** |

## I.  INTRODUCTION

As time is short, Counsel is filing an abbreviated response to the Motion for Preliminary Injunction [Dkt 11] on behalf of Mr. Hauter. Counsel would be remiss, however, if she did not point out to the Court that it does not appear adequate efforts have been made to notify the various defendants of the scheduled hearing, if the manner in which notice was given to Mr. Hauter was followed in all cases. That issue is separately addressed at the close of the argument.

## II.  FACTS

Plaintiffs have sued Mr. Hauter and an entity they call www.nconlinegames.com. Mr. Hauter is the owner of the domain name nconlinegames.com and created the website that is posted on the domain at www.nconlinegames.com. For purposes of this motion alone, we assume, without being certain, that Mr. Hauter is thus identical to the entity whom Plaintiffs describe as www.nconlinegames.com.

Plaintiffs allege that they investigated potential online infringers—presumably including Mr. Hauter and the website at www.nconlinegames.com, in the fall of 2022. Dkt. 1-1, ¶¶ 6,7.

Page 1

They took no action until filing their complaint in March of this year, about six months after their investigation.

Substantively, Plaintiffs assert that Mr. Hauter and his website are liable for copyright and trademark infringement because the website at www.nconlinegames.com serves as a location through which Mr. Hauter and his website and a series of unidentified "Doe" defendants "market, distribute, and operate the infringing Phantom Software" via "their virtual presence," and that the website "markets and provides distribution information for Phantom Software." (Compl. ¶¶ 195, 196). They then provide a single example, an undated screenshot which they assert is representative of the website. (Compl. ¶ 196). There are no other particularized allegations of facts on which claims of infringement can be based.

Nothing in the complaint shows that the website actually functions. The declaration submitted by Plaintiffs in support of their complaint does not claim that they tested the website and actually found infringements. Instead, declarant Mullins says only that he "visited" the website. There is no statement that anyone else associated with Plaintiffs even went that far. Dkt 1-1, ¶8.

Mr. Hauter has provided a declaration regarding the website and its genesis, attached as Ex. A. In brief, he was hired for $200 to create a very simple website using a template that would be populated with text and images provided by the client. He was not hired to create software, to link to software, to post games or other software, or to create links to external products such as games, and did not do so. While the website has pictures that the client supplied, presumably of products to which the client had negotiated rights and expected to be able to sell or license, the website has no links to any such products and cannot possibly function as an online gaming site. Neither can it accept purchases from consumers; it has no products

available for use, license, or sale, and any attempts to spend money on the site are rejected. Hauter Decl. ¶¶ 6-23. This lack of functionality can be tested simply by logging into the site and attempting to use it. The undersigned has done so; it is not difficult.

Mr. Hauter's client wanted more than he provided, and expressed his dissatisfaction with the site. Mr. Hauter has never been paid for his work. Since he wasn't paid, he never released the site to the client or anyone else who could post software, or games, or links to either of those. Thus, the website www.nconlinegames.com has been, and remains, nonfunctional. Indeed, but for this lawsuit and concern that no changes should be undertaken to the site lest they be viewed as spoliation, the website would already have been removed from public view. Hauter Decl. ¶¶ 16-23.

Nonfunctional websites do not generate income, and the declaration includes evidence to that effect. Hauter Decl. ¶ 21.

### III.  ARGUMENT

**A.     LEGAL STANDARD FOR PRELIMINARY INJUNCTIONS**

This Court is well aware of the standard for preliminary injunctions and the disfavor with which such injunctions are viewed, having set out the standard and pertinent law in its prior recommendation [Dkt 26], which was adopted by order entered on April 6 [Dkt 28]. That law will not be repeated. Suffice it to say that the burden is on Plaintiffs to show, separately as to each defendant, that as to the targeted defendant, (1) Plaintiffs are likely to succeed on the merits; (2) Plaintiffs are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities (relative hardship to the parties) tips in Plaintiffs' favor; and (4) an injunction is in the public interest. As to the second factor, the Supreme Court noted in *Winter v. Natural Res. Def.*

*Council, Inc.*, 129 S. Ct. 365, 375–76 (2008) that showing a mere "possibility" of irreparable harm is insufficient.

While the cases have not, so far as counsel discovered in the very short available time, expressly addressed whether the standard must be met as to <u>each</u> defendant sought to be enjoined, due process surely requires that result, just as it requires that each defendant have first been served before being enjoined, and that there be evidence supporting the court's jurisdiction over the targeted defendant. *See, e.g.*, *R.M.S. Titanic, Inc. v. Haver,* 171 F.3d 943, 957 (4th Cir. 1999) ("a party cannot obtain injunctive relief against another without first obtaining *in personam* jurisdiction over <u>that</u> person or someone in legal privity with <u>that</u> person."[emphasis added]) and *Visual Sciences v. Integrated Communications*, 660 F.2d 56 (2d Cir. 1981).

**B.   A nonfunctional website that had never been placed in use is unlikely to be found infringing in any respect and does not create a likelihood of irreparable harm**

Plaintiffs' single-screenshot evidence of "infringement" pales in the face of the evidence that the site is entirely nonfunctional, no matter what Plaintiffs had assumed from simply "visiting" and looking at it. Bringing allegations of infringement based upon a glancing "visit" to a website is entirely unwarranted, and falls far short of the evidence required to support any claim of infringement.

Indeed, it is not possible that the website at www.nconlinegames.com infringes Plaintiffs' game software or markets software under an infringing trademark, since the website does not now, and never has, functioned. It is no more than a shell, with no live links to external software or games, and no on-site games. As summarized above and recounted in his declaration, Mr. Hauter was hired to create a very basic Wix website, for $200. That price did not include—at least from his perspective—linking the site to any external products or populating it with software. As a result, no such activities ever occurred. He assumed, as is reasonable, that if the

site were ever populated with products, those products would be lawful. Indeed, Plaintiffs admit that they authorize others to use and distribute their software (e.g., Compl. ¶¶ 1, 150), so Mr. Hauter's assumption that his client had such authority was entirely rational. And, those who carry legitimate products for sale or license would be entitled to advertise them.

**C.     Plaintiffs themselves have unreasonably delayed seeking relief for many months, further evidencing the absence of irreparable harm from delay, and thus the absence of need for pretrial relief**

The declaration that Plaintiffs filed with their complaint asserts that their investigation of purported online infringements occurred starting in the Fall of 2022, and that only after that investigation was done did they move on to investigating physical locations, which were visited in September and October of 2022. [Dkt. 1-1, ¶¶ 6-7]. In the months that intervened from September until Plaintiffs served Mr. Hauter with their complaint, there was no notice given to him of their purported concerns, and no other action taken to halt or take down the allegedly infringing website. Plaintiffs could have entirely avoided the continuation of infringement by Mr. Hauter had they simply notified him of their concerns. In the unlikely event that he did not take appropriate action, Plaintiffs had other options for prompt relief. For example, undersigned counsel regularly represents clients whose rights are the subject of online infringements, and knows that even if domain owners do not respond to takedown notices—which were never even attempted in this case—website registrars and hosts are very responsive to requests for takedown of sites. Allowing the purported infringements to continue unchecked for more than six months belies the need for injunctive relief at this late point, when there has been no change in circumstances.

**D.     There has been no income attributable to the allegedly infringing website, and the relief sought, which includes seeking to block Mr. Hauter's financial activities and interfere with his banking relationships, and seizing his computer and other assets, is entirely unreasonable, such that the equities tilt in his favor**

Mr. Hauter's declaration provides clear evidence that there have been no sales attributed to activities of, or on, the accused website at www.nconlinegames.com, and no other wrongful acts on his part are alleged. Wix keeps sales records, and a copy is provided in Mr. Hauter's declaration showing the absence of sales—in addition to his own declaration to that effect. Indeed, he has not even been paid the $200 he had expected to receive as a result of creating the website template, nor been reimbursed for his purchase of the domain. Plaintiffs' request to seize his bank accounts, freeze his assets, take his computer, and otherwise interfere with his possessions and banking relationships has no rational foundation and would cause harm to him that is entirely disproportionate to anything to which Plaintiffs are entitled.

**E.     Plaintiffs have not pled the legality of their allegedly infringed rights and instead have made allegations tending to show the illegality of the rights they seek to enforce; public policy does not support enforcing rights in illegal products**

Plaintiffs coyly describe their products, in the first paragraph of their complaint, as "computer software and entertainment games that are used in various formats throughout the country." But they later describe their marketing efforts and in doing so, appear to describe the products as goods that are unlawful under the laws of North Carolina. For example, in Paragraph 60, Plaintiffs describe their "online penny auction website which allows participating bidders to earn game play credits to play promotional games using the Legacy Software. When a participant uses their credits to play a Legacy Software game, they earn store credit that can be used to shop at a wide range of well-known retailers."

North Carolina law states that it is illegal for any person or organization to operate a game of chance or to play or bet on any game of chance that involves winning money, property

Page 6

or anything of value. Violators are guilty of a Class 2 misdemeanor. N.C. Gen. Stat. 14-292. Plaintiffs' description of the rights they seek to enforce appears to match the games of chance that are expressly prohibited under North Carolina law as well as the laws of other states. Epic Tech's own games have been found to violate such laws in at least some prior cases, including a series of cases in Alabama beginning with *State v. Epic Tech LLC,* 323 So. 3d 572 (2020) (which has several follow-on cases of similar ilk).

If, indeed, the products that Plaintiffs allege are being infringed are themselves unlawful for use in the State of North Carolina, then it is questionable whether Plaintiffs can prevail. For instance, in *Strike 3 Holdings LLC v. Doe,* 2018 WL 6027046 (D. D.C. 2018), the Court dismissed a lawsuit on the basis that the content sought to be protected was so pornographic as to be obscene, stating in a footnote (fn 5) that pornography may not be entitled to copyright protection. Although overturned on other grounds, that decision is not alone. *See, e.g., Strike 3 Holdings LLC v. Doe*, No. 3:21-cv-993 (MPS), 2021 U.S. Dist. LEXIS 196955 at *6 (D. Conn. Oct. 13, 2021) and *Next Phase Distribution, Inc. v. Does 1-27*, 284 F.R.D. 165 at 171 (S.D.N.Y. 2012). Gambling products are equally disfavored, not only at the state but also the federal level. The Department of Justice maintains that, under the Wire Act, all Internet gambling by bettors in the United States is illegal. U.S. House of Representatives Committee on the Judiciary Hearing on Establishing Consistent Enforcement Policies in the Context of Online Wagers, 110th Cong., Nov. 14, 2007 (testimony of Catherine Hanaway, U.S. Attorney (E.D. Mo.), Dept. of Justice). And, in 2006, Congress passed the Unlawful Internet Gambling Enforcement Act, which made it illegal for wagering businesses to knowingly accept payment in connection with unlawful Internet gambling (though it does not itself make Internet gambling illegal). 109 Pub. L. 109-347, Title VIII (Oct. 13, 2006) (codified at 31 U.S.C. §§ 5301, 5361–67). That Act also authorizes the Federal Reserve System to create regulations that prohibit financial transaction

Page 7

Case 5:23-cv-00136-D-RJ   Document 54   Filed 04/24/23   Page 7 of 11

providers (banks, credit card companies, etc.) from accepting those payments. See 31 U.S.C. § 5363(4).

Whether Plaintiffs' gambling products are entitled to protection and, if so, to what extent raises questions of law yet to be decided in the Fourth Circuit and by the Supreme Court, and provides further reasons as to why Plaintiffs may not prevail and why at the least, the interests of the public would not be served by assisting their potentially illegal conduct before a final determination can be reached.

F.  **It is likely that adequate notice of the motion and of the hearing have not been given to the defendants as a whole, and public policy does not favor rewarding such conduct**

Plaintiffs refrained from serving the complaint on the defendants pending a decision on their motion for issuance of an *ex parte* temporary restraining order. An order denying that relief was issued by Judge Dever on April 6 [Dkt 28]. In that order, plaintiffs were ordered to serve the complaint and motion for a preliminary injunction on defendants. Summonses for each defendant previously had been issued on March 22 [Dkt 24] and no amended summons had been requested on or before the date of the order.

Mr. Hauter was served with the summons and complaint and other documents in this matter on April 11—five days after the order was entered. In spite of the delay in service, efforts could have been made to actually give effective notice—for example, by including a cover letter with notice, or by serving the order as the first document in the package and tagging the provision as to the hearing. No such precautions were taken, as is evident from Mr. Hauter's declaration (Ex. A at ¶¶ 3-4). And, precautions should have been taken, in order to avoid violating the rights of defendants to adequate notice.

As is evident from the Affidavit of Service [Dkt 33] and the Court's records [Dkt 1 – 28], the amount of paper served on Mr. Hauter was voluminous—well in excess of 500 pages, the

Page 8

content of which would not be readily comprehensible by an average citizen. In fact, the volume was so large that Mr. Hauter's mother thought it might be an Amazon delivery of a hoped-for air fryer. (Hauter Decl. ¶3)

Instead of a comprehensible summary, the first page of the package, as is traditional, was the summons. And as is evident [Dkt 24], the summons stated on its face that a written response would be required in 21 days. The nature and placement of that notice necessarily would induce reliance on it by the recipient, in the absence of something to the contrary.

But here, the package proceeded in numeric docket order. Buried at the back of the package, below well over 500 prior pages of other material, was the two-page order signed by Judge Dever [Dkt 28], which on the second page thereof set this matter for hearing on Monday, April 24, 2023. The Affidavit of Service reflects the absence of any correspondence in the package that was served, and describes Judge Dever's order as "COURT'S ORDER OVERRULING PLAINTIFFS' OBJECTIONS TO COURT'S MEMO AND RECOMMENDATIONS," without reference to any hearing.

Mr. Hauter was not effectively informed of the hearing, or that anything requiring a response or appearance earlier than May 3 was required, until after he contacted the undersigned's office on April 19, 2023 and the undersigned made time that day to investigate potential deadlines. Based on his experience, it is likely that others of the defendants were equally uninformed and have not voluntarily waived their right to contest the motion at issue. Rewarding such conduct by Plaintiffs is not in the public interest.

## IV. CONCLUSION

For the reasons stated above, Plaintiffs' motion for a preliminary injunction should be denied, at least as to Mr. Hauter and, to the extent it is synonymous with him, as to www.nconlinegames.com.

This the 24th day of April, 2023.

        OLIVE & OLIVE, P.A.
        Attorneys for Plaintiffs

BY:   s/ Susan Freya Olive
        Susan Freya Olive
        N.C. State Bar No. 7252
500 Memorial Street
Durham, NC 27702-2049
Telephone: (919) 683-5514
emailboxEDNC@oliveandolive.com

## CERTIFICATE OF COMPLIANCE WITH WORD LIMIT

Pursuant to Local Civil Rule 7.2(f)(3), the undersigned counsel certifies that the foregoing memorandum contains 2,800 words (fewer than the permitted 8,400 words for such memoranda), excluding the parts of the document that are exempted by Local Civil Rule 7.2(f)(1), when counted by Microsoft Word, which was the program used to prepare the document.

## CERTIFICATE OF SERVICE

As to those parties not filed by service of this pleading with the court's electronic filing system, the undersigned certifies that a true copy of this pleading and any exhibit or proposed order filed therewith is being served on all such parties whose addresses have been disclosed in the pleadings and that are not in default, by mailing a copy of the same to them via first class

mail, addressed to them at the address provided for them in the Affidavit of Service or, if not served, in the Summons, on the 24th day of April, 2023.

s/Susan Freya Olive  
Susan Freya Olive